UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x

CATHAY BANK,

       **Plaintiff,**

   -against-            **OPINION & ORDER**

JOSE ANTONIO BONILLA and JULIO    17-cv-3551 (NG) (SIL)
CESAR MONTALVO, as Administrators
for the Estate of PAULA MALLIARAKIS,
deceased, pursuant to Limited Letters of
Administration, GEORGE MALLIARAKIS
a/k/a GEORGIOS MALLIARAKIS,
26ROADASTORIA LLC, APHIS REALTY,
INC., 1847 ASTORIA LLC, DIMITRIOS
PISTIKOS, and DIONYSIOS KALIAMPOS,

       **Defendants.**
----------------------------------------------------------x

**GERSHON, United States District Judge:**

   This case concerns a series of transfers of real property initially owned by Defendant

George Malliarakis and disputes over mortgages on that property.  Plaintiff Cathay Bank

("Cathay") alleges a pattern of fraud in property transactions between 2014 and 2016 which injured

its rights as a creditor.

   Presently before the court are two motions for partial summary judgment pursuant to Rule

56(a) of the Federal Rules of Civil Procedure.  First is the motion of Cathay to 1) set aside three

transactions involving the property in question, one each in 2014, 2015, and 2016, as

constructively and actually fraudulent conveyances pursuant to N.Y. Debt. & Cred. Law § 270, *et*

*seq*.; 2) set aside encumbrances currently held by two Defendants on the property; and 3) obtain

attorneys' fees.  Second is the motion of Defendants 26RoadAstoria LLC and Aphis Realty, Inc.

1

(together, "Mortgagee Defendants") for an equitable lien pursuant to the doctrine of equitable subrogation asserted as an Affirmative Defense to Cathay's claims.

For the reasons set forth below, Cathay's motion is granted, and, on the Mortgagee Defendants' motion, summary judgment is granted to Cathay.

I.    **Background**

    **A. Factual History**

The following facts, relayed in chronological order, are undisputed except where otherwise noted.

    **1. The Parties' Relationships Prior to 2011**

George and Defendant Paula Malliarakis were a couple for approximately thirty years, until March 2010. They never legally married, and George was legally married to another woman in Greece, but they held themselves out as husband and wife during their time together. In 1977, George acquired the real property located at 18-47 26th Road, Astoria, New York ("Astoria Property") which is the subject property of the instant dispute. It is an income-generating rental property. In 1999 George purchased another residential property located at 3385 Bay Front Place, Baldwin, New York ("Baldwin Property") together with Paula in both of their names as tenants in the entirety. George and Paula began living together at the Baldwin Property in 2001.

In 2007, a company wholly owned by George, 458 East 144th Realty Corp. ("458 Corp."), borrowed $800,000 from Cathay's predecessor, Asia Bank. This loan was secured by a mortgage on the Baldwin Property, delivered by George and Paula together, which required the payment of taxes on that property. George alone executed a personal guaranty of repayment of the Baldwin Loan and Baldwin Mortgage in December 2007. From 2008 through 2013, no taxes were paid on the Baldwin Property.

George paid no federal income taxes in 2006, 2007, or 2008.  In September 2009, a federal tax lien was filed against the Baldwin Property for $237,752.83.  In 2010, three judgments in favor of various non-party creditors against George and a fourth against both George and Paula were entered in Nassau County, totaling $136,542.11.[1]  According to tax records, George and Paula jointly claimed an income of only $40,395 in 2010, of which $29,074 was from rentals of the Astoria Property.

By deed dated February 12, 2010, and recorded April 7, 2010, George transferred the full ownership interest in the Astoria Property from only himself to himself and Paula as tenants in common, effectively conveying to Paula a 50% interest and retaining a 50% interest himself.  The Deed and Real Property Transfer Report indicate that zero dollars were paid in transfer taxes and the full sale price was zero dollars.

In March 2010, George and Paula separated.  By March 2011, no portion of the tax lien, nor any of the aforementioned judgments, had been satisfied.  At that time, back taxes on the Baldwin Property were due in a principal amount of $103,017.20.[2]

## 2. 2011: George and Paula Sign an Agreement

On March 31, 2011, George and Paula signed and had notarized a written document titled "Agreement" which states that the Agreement was entered into out of a desire by George and Paula to "settle their financial, property and other rights and obligations arising out of their

---

[1] Cathay identifies the total amount of these judgments to be $139,450.  Plaintiff's Memorandum of Law ("Pl. Mem.") at 2.  However, the court calculates this total instead based on the amounts listed in each of the judgments attached to their motion as Plaintiff's Exhibits 28–31 (10,922.64 + 8,962.67 + 8,811.84 + 107,844.96 = 136,542.11).

[2] Defendants contest this fact on the basis that the evidence provided does not support the claim, not by presenting their own evidence to the contrary; a review of the tax document offered as evidence does support this fact.  *See* Pl. Exh. 27, Nassau County tax bill as of Jan. 14, 2014.

relationship[.]" Agreement at p. 2.  The Agreement recognized, *inter alia*, that "inasmuch as they are not legally married, the parties are free to separate from each other without the obligations inherent in a legal marriage between two parties" and "there is no legal right or obligation in either party regarding financial obligations, including income, expenses, assets, liabilities, and assets transferred." *Id.* at p. 1.  Among other clauses, the Agreement provides for the following:

1) with respect to the Baldwin Property, "simultaneously with the execution of this Agreement, George and Paula have conveyed [it] to themselves as tenants in common" and it "promptly shall be placed on the market for sale," the proceeds of which shall in the first instance be used to pay off liens against it; *id.* at pp. 2–3;

2) with respect to the Astoria Property, "[s]imultaneously with the execution of this Agreement, George shall convey and transfer his interest in [it] to Paula" and Paula "agrees to, and hereby does, indemnify and hold George harmless from and against any and all loss or damage relating to any claims, mortgages, charges, or liens against [it];" *id.* at p. 4;

3) Paula agrees to change her social security registration information to reflect the last name of "Roldan," which it had been prior to her taking on the name "Malliarakis;" *id.* at p. 6;

4) George and Paula mutually release and discharge any claims to any property of the other; *id.* at pp. 6–7; and

5) George and Paula mutually release all claims one may have against the other arising prior to the date of the agreement.  *Id.* at p. 7.

Following the Agreement, George did not promptly transfer his interest in the Astoria Property to Paula; the Baldwin Property was never deeded to George and Paula as tenants in common; and the Baldwin Property was never placed on the market or sold.  George testified that he did not receive anything of "tangible value" in exchange for signing this Agreement.  Deposition of George Malliarakis ("George Dep."), May 6, 2021, at 10:12–14.  Despite never legally marrying and the 2011 Agreement, Paula's tax returns for both 2011 and 2012 indicate that she was married,

filing separately, and list George as her spouse.  These tax filings are also made under the name "Malliarakis," not "Roldan," and nothing in the record indicates that she ever changed her name.

### 3.   2014: Lawsuit Commenced Against George and Paula; George Transfers Astoria Property to Paula ("2014 Transfer")

On January 24, 2014, Cathay's predecessor commenced *Asia Bank, N.A. v. 458 E. 144th Street Realty Corp. et al.*, Index No. 768/2014, in New York State Supreme Court, Nassau County, against, among others, George and Paula, seeking foreclosure of the Baldwin Property and a deficiency money judgment against George ("Baldwin Property Foreclosure Action").  George and Paula were served with the summons and complaint on January 30, 2014.

By deed dated February 28, 2014, executed by George on March 4, 2014, and by Paula on March 6, 2014, George conveyed to Paula his remaining 50% interest in the Astoria Property ("2014 Transfer").[3]  George testified that he did not receive a "tangible benefit" in exchange for making this transfer.  George Dep., May 6, 2021, at 9:1–3.  The Real Property Transfer Report filed with the Deed indicates a sale price of $0.00; the Recording and Endorsement Cover Page of the Deed indicates $0.00 paid in transfer taxes.  At this time, the Astoria Property was valued at $1,050,000.

As of February 28, 2014, George had not paid off any of the IRS Lien or prior judgments against him.  George reported an income on his tax filings in 2013 of $25,721 and in 2014 of $3,361.  After the transfer, it is undisputed that he retained only the following assets:

- The Baldwin Property, the mortgage on which he and Paula ceased making payments in December 2013.  By January 2014, the entire $800,000 principal on the Baldwin Mortgage remained due under the note.  In addition, he and Paula continued to default on property taxes on this property, and by January 2014 George owed a debt for such amounting to $400,661.21.  On January 21, 2014, Cathay's

---

[3] The deed was recorded on December 15, 2014.

predecessor paid that amount to the County of Nassau to cover the back taxes owed to protect its interest.

- A property in Fort Ann, New York, which was appraised to have a fair saleable value in February 2014 of $136,000 but back taxes owed of $25,000.

- A property in Liberty, New York, which was appraised to have a fair saleable value in February 2014 of $60,000 but back taxes owed of $27,500.

- A property at 450 East 144th Street, which in 2013 and 2014 had an estimated value of $2.2 million, but outstanding debt on its mortgage of $3.1 million, and back real estate taxes of $126,000 owed.

- A property at 454 East 144th Street and another property at 458 East 144th Street, which, when combined, in 2013 and 2014 had an estimated value together of $900,000, but the outstanding debt on the mortgage for these two properties was $1.35 million, and back real estate taxes of $147,000 owed.

### 4.   2014–2015: Baldwin Property is Foreclosed, Auctions are Scheduled, and Paula Twice Files for Bankruptcy

On June 22, 2014, an order was entered finding Cathay's predecessor in the Baldwin Property Foreclosure Action entitled to summary judgment. On October 28, 2014, a Judgment of Foreclosure and Sale was entered. It provided that $1,282,381.67 was owed to Cathay on the Baldwin Mortgage; it authorized an auction of the Baldwin Property; and it permitted a deficiency judgment to be entered against George.

After an auction for the Baldwin Property was initially noticed for January 2015, Paula obtained a stay pending appeal, which was vacated on February 23, 2015 after Paula failed to pay use and occupancy fees required by the stay. The auction was then scheduled for April 14, 2015, and Paula filed a bankruptcy petition the day before, on April 13, 2015. Cathay moved to lift the automatic bankruptcy stay in order to continue the Baldwin Property foreclosure. Cathay's motion

to lift the stay included references to the Baldwin Property Foreclosure Action, and Paula attached the Baldwin Property Foreclosure Action complaint as an exhibit to her opposition to the motion. This first bankruptcy petition was dismissed on July 24, 2015, without discharging any of Paula's debts.  The auction was then noticed again, this third time for September 1, 2015.  Paula filed a second bankruptcy petition on August 31, 2015.  This second petition was dismissed pursuant to a so-ordered stipulation entered November 3, 2015.  Details of these filings will be discussed in the legal analysis below.

### 5. 2015: Paula Transfers Astoria Property to 1847 Astoria LLC ("2015 Transfer")

After her two bankruptcy petitions were dismissed, the second one in November 2015, Paula sought to obtain a loan from non-party Fifth Avenue Capital, LLC ("Capital") in the amount of $600,000 to be secured by a mortgage on the Astoria Property.[4]  In connection with this loan, Capital required that Paula form a new corporate entity, 1847 Astoria LLC, and transfer to it title to the Astoria Property.  The parties agree this request was made to "isolate" the Astoria Property from any claims of Paula's past, present, or future creditors, *see* Deposition of Marc Schulder ("Schulder Dep.") at 106:21–107:25.  Paula entered into a Single-Member Operating Agreement for 1847 Astoria LLC on November 24, 2015.  From its inception through October 19, 2016, Paula was the managing member, sole member, and sole owner of 1847 Astoria LLC.

On December 2, 2015, Paula transferred the Astoria Property to 1847 Astoria LLC ("2015 Transfer").  There was no consideration for this transfer.[5]  On the same date, Capital extended a

---

[4] Capital is a private equity lender which was formed in November 2015 out of Enterprise Asset Management, Inc., the entity which Paula first approached for a loan at that time.  The parties agree these entities acted as one and the same with respect to the relevant transactions in this case.

[5] A Real Property Transfer Report shows a sale price for the property of $0.00, and no evidence to the contrary has been produced.  However, Defendants are not consistent as to whether they admit the lack of consideration for the 2015 Transfer.  In their counter statement of material fact, they

loan of $600,000 to 1847 Astoria LLC, secured by a mortgage on the Astoria Property.  This loan

had a very high annual interest rate of 10%, required Paula to pay associated expenses (including,

among other things, prepaid interest of $45,667.58), and imposed a balloon payment for the full

principal amount of $600,000 no later than September 30, 2016.  The day before the transfer, Paula

had a negative net balance in her bank account.

Prior to extending the loan, Capital obtained a title search via Fidelity National Title

Insurance Services, LLC for the Astoria Property which showed that the 2014 Transfer had been

without consideration.[6]  The Title Report noted that:

> The last deed of record recorded [for this property] was a transfer
> for no consideration. In connection therewith, the following
> documentation must be reviewed by this Company prior to closing.
> (Note: Upon receipt and review, additional exceptions to title may
> be raised).(a) Affidavit from the attorney who supervised the
> execution and delivery of the deed and/or;(b) Affidavit from the
> grantor(s) confirming the conveyance and a copy of the photo
> identification of said grantor(s).

Fidelity Title Report at P982.

No affidavits were obtained, but the title reader spoke with the attorney who represented

George in the 2014 Transfer, who informed the title reader that the transfer was made pursuant to

the separation between George and Paula.  Capital obtained a credit report on Paula dated

November 17, 2015, which showed Paula had over $150,000 in debt and that twelve of her

---

admit no consideration was paid in ¶ 153, but later deny it in ¶ 171.  Further, in their opposition
briefs, Mortgagee Defendants argue that the lack of consideration is an issue of fact, Opp. of
Mortgagee Defs. at p. 14–15, while Defendants 1847 Astoria LLC, Dionysios Kaliampos, and
Dimitrios Pistikos concede that the 2015 transfer was "a no consideration transfer[.]"  Opp. of
1847 Astoria LLC, Kaliampos, and Pistikos at p. 9.  In any event, no Defendant has offered any
proof of consideration for the 2015 transfer.

[6] Defendants dispute that the 2014 Transfer was for no consideration, but do not dispute that the
title report described it as such.

accounts had recently been in collection.  Capital also obtained the 2011 Agreement, and it was aware of the two bankruptcies Paula had previously filed and that they had been dismissed.

Plaintiff offers title expert Howard Kei, who opines that Capital's title insurer Fidelity did not engage in sufficient due diligence with regard to the title.  In response, Defendants offer title expert Friedman who opines to the contrary.  As discussed below, this dispute is immaterial.  In addition, Plaintiff offers a private equity lending expert, William Barone, and Defendants have a counterpart private equity lending expert in Marc Schulder.  They each opine as to whether Capital engaged in the necessary investigation and what those investigations would have revealed about the borrower (Paula).  The nature of these opinions and whether they raise issues of fact will be discussed in detail in the legal analysis below.

### 6.   The Events of 2016 Prior to the Transfer of 1847 Astoria LLC

The Baldwin Property auction in connection with the foreclosure action was again scheduled, for the fourth time, to occur on January 19, 2016.  On that same date, Paula filed an involuntary bankruptcy petition against George, which was ultimately dismissed in May 2016.  The Baldwin Property auction took place prior to Cathay receiving notice of this bankruptcy petition, and Cathay had successfully bid $750,000 for the Baldwin Property.  At a hearing on the involuntary bankruptcy petition against George, the court "found that the filing of the Involuntary Petition was part of a scheme to delay, hinder, or defraud a creditor."  March 1, 2016 Bankruptcy Court Order.[7]

On March 1, 2016, Aphis Realty, Inc. extended a $75,000 loan to 1847 Astoria LLC secured by a mortgage on the Astoria Property.  At all times relevant to this action, Defendant Dimitrios Pistikos was the sole officer, director, and shareholder of Aphis Realty, Inc., and was

---

[7] Defendants deny this fact, but a plain reading of the order provides the quoted language.

the only manager and member of 26RoadAstoria LLC.[8]  The $75,000 loan was the first loan Aphis ever made.  Prior to the loan, Aphis Realty, Inc. conducted a title search on the Astoria Property in which the deed from the 2015 Transfer was found (which noted that no real property transfer taxes were owed) and requested a bankruptcy search for 1847 Astoria LLC, but not Paula.  Paula never made any payments on this loan.

Then, in April and May 2016, Pistikos personally attempted to acquire the Astoria Property.  To accomplish this, he signed an agreement with 1847 Astoria LLC, also signed by Paula as 1847 Astoria LLC's principal, to purchase the property for $875,000. During this time period, on May 3, 2016, a $455,000 money judgment was entered in favor of Cathay against Paula in a separate Eastern District of New York action, *Paula Malliarakis v. George Malliarakis et al.*, No. 15-cv-05060.[9]  No part of that judgment has yet been paid.

In the process of Pistikos' purchase attempt, a range of potential title issues were raised in a May 2016 email thread which included Pistikos' counsel in the transaction, John Mincone.  These potential title issues included Paula's two dismissed bankruptcies, the involuntary petition for bankruptcy she filed against George, the fact that no money was exchanged for the 2014 and 2015 transfers, and the money judgment entered against Paula.  There is no dispute that these issues were discussed via email among the title agent and counsel, including Mincone, or that the closing on the property never took place.

---

[8] Kaliampos represented to Cathay's counsel in a February 4, 2020 letter that he was the principal and managing member of 26RoadAstoria LLC, 1847 Astoria LLC, and Aphis Realty, Inc. However, his deposition testimony clarified that, despite that letter, he does not, in fact, own or manage any part of 26RoadAstoria LLC or Aphis Realty, Inc.  Moreover, Defendants' admissions in their response to Cathay's Statement of Undisputed Facts concede that Kaliampos does not own any part of or manage 26RoadAstoria LLC, and is not a member of or manage Aphis Realty, Inc.

[9] Judgment was rendered on a counterclaim brought by Cathay.

Finally, a few months later, on August 18, 2016, Aphis Realty, Inc. extended a second loan of $30,000 to 1847 Astoria LLC, secured by another mortgage on the Astoria Property.  This mortgage was never recorded.  The next day, on August 19, 2016, Capital assigned its $600,000 mortgage and loan to Pistikos' company, 26RoadAstoria LLC, for a purchase price of $662,500. Capital's title insurance policy was also assigned to 26RoadAstoria LLC.  26RoadAstoria LLC did not run a credit check on either 1847 Astoria LLC or Paula prior to the mortgage assignment.

### 7.  2016: Paula Transfers 1847 Astoria LLC to Kaliampos

On October 19, 2016, Paula transferred her entire membership interest in 1847 Astoria LLC to Kaliampos via a Membership Interest Sale Agreement ("2016 Transfer"), even though 1847 Astoria LLC's Single-Member Operating Agreement prohibited Paula from transferring this membership interest.  According to testimony by Paula's attorney, Paula was insolvent after the 2016 Transfer.  The parties do not dispute that Kaliampos served as a "front man" for Pistikos in this transaction.  Kaliampos and Pistikos had agreed, orally, that after the transfer Kaliampos had the option of either turning the Astoria Property over to Pistikos or retaining it for himself if he paid Pistikos for the assumed mortgages in their entirety and the expenses of the transfer.  Mincone, the attorney who represented Pistikos when he tried to acquire the Astoria Property earlier in 2016, also represented Kaliampos in this transfer.  Pistikos himself paid all of the disbursements and expenses of the closing on the 2016 Transfer.

No title search on the Astoria Property was made in preparation for this transfer.  At the time of the transfer, the fair saleable value of the Astoria Property was $1,075,000.  In exchange for the 2016 Transfer, Kaliampos assumed the three mortgages on the Astoria Property (the Capital mortgage assigned to 26RoadAstoria LLC and the two Aphis Realty, Inc. mortgages), the

cumulative value of which was $705,000.  In connection with this transfer, Pistikos also paid Paula $80,000 in installments in October 2016 both directly and through a third party.

The parties do not dispute that, following the 2016 transfer, Pistikos has solely made all of the decisions regarding 1847 Astoria LLC, and Kaliampos has had no involvement with the Astoria Property.  Pistikos has set rents on the Astoria Property, negotiated with tenants, made the decision to commence eviction proceedings, and collected rents, first via Aphis Realty, Inc., and then, since August 2019, directly to his personal bank account.

After this transaction, on December 12, 2016, a deficiency judgment in the total amount of $793,294.23 was entered against George in the Baldwin Property Foreclosure Action.  As of the date of the filing of the pending motions, George had made two partial payments on this judgment, totaling $109,014.80, with the remainder unsatisfied.

### B.  Procedural History

Cathay initiated this action on June 13, 2017.  While the case was underway, Paula passed away on August 28, 2017.  The litigation was stayed until after the Queens County Surrogate's Court appointed administrators Jose Antonio Bonilla and Julio Cesar Montalvo for her Estate on September 20, 2019.  On October 9, 2019, the stay was lifted and the case caption changed to reflect the administrators' substitution for Paula in this litigation.

Following the close of discovery, the court held a pre-motion conference on November 12, 2021.  Cathay and the Mortgagee Defendants filed their motions for partial summary judgment on April 11, 2022.  Oral argument on the instant motions took place on July 21, 2023.

## II.    Standard of Review

A movant is entitled to summary judgment only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a);

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).[10]   Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp.,* 477 U.S. at 322.   Only disputes relating to material facts—*i.e.*, "facts that might affect the outcome of the suit under the governing law"—may preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).   An issue of fact is "'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323.   Once the moving party has asserted facts showing that the non-movant's claims cannot be sustained, "the nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.*" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks omitted).

In determining whether to grant summary judgment, the court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." *Dickerson v. Napolitano*, 604 F.3d 732, 740 (2d Cir. 2010).   But "[t]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving

---

[10] Neither George nor Paula's administrators opposed Cathay's summary judgment motion. However, that fact alone is not a sufficient basis on which to grant summary judgment even with respect to the claims which concern only them.   "Rule 56 does not allow district courts to automatically grant summary judgment on a claim simply because the summary judgment motion, or relevant part, is unopposed." *Jackson v. Fed. Exp.,* 766 F.3d 189, 194 (2d Cir. 2014).   Courts instead must review the motion and determine whether the moving party is entitled to summary judgment as a matter of law. *See Vermont Teddy Bear Co. v. 1-800 Beargram Co.,* 373 F.3d 241, 246 (2d Cir. 2004).

party].” *Anderson*, 477 U.S. at 252.  While “circumstantial evidence may be . . . sufficient to raise

a genuine issue of material fact precluding the grant of summary judgment,” *Gayle v. Gonyea*, 313

F.3d 677, 684 (2d Cir. 2002), a party cannot survive a motion for summary judgment by relying

on “mere speculation or conjecture as to the true nature of the facts,” *Hicks v. Baines*, 593 F.3d

159, 166 (2d Cir. 2010) (internal quotation marks omitted), and “must come forward with specific

facts showing that there is a genuine issue for trial[.]” *Matsushita*, 475 U.S. at 586–8 (emphasis

removed).  The nonmoving party must show “significant probative evidence” of a genuine dispute

as to a material fact. *Anderson*, 477 U.S. at 249 (internal quotation omitted).

When deciding a motion for summary judgment, courts must take into account the

evidentiary burden of proof applicable at a trial on the merits and measure the evidence submitted

against that burden of proof.  *Anderson,* 477 U.S. at 254–55. *“*While case law makes clear that

plaintiff must prove its Section 276 claim by clear and convincing evidence,” “courts are divided

as to the appropriate standard of proof for claims brought under Sections 273, 273-a, and 275.”

*Axginc Corp. v. Plaza Automall, Ltd.,* No. 14-CV-4648 (ARR) (VMS), 2022 WL 1591054, at *4,

n.5 (E.D.N.Y. May 19, 2022) (citations omitted); *see also Federal Nat. Mortg. Ass’n v. Olympia

Mortg. Corp,* 792 F.Supp.2d 645, 650 (E.D.N.Y. 2011) (comparing *Lippe v. Bairnco Corp.,* 249

F. Supp. 2d 357, 376 n. 6 (S.D.N.Y. 2003) (concluding that fraud under § 273 must be proved by

a preponderance of the evidence) and *Farkas v. D'Oca,* 305 A.D.2d 237 (1st Dept. 2003) (noting

that the trial court applied the clear and convincing evidence standard to a claim for constructive

fraud under § 273)).  I will apply the more stringent standard.  *See Fed. Nat. Mortg. Ass’n*., 792 F.

Supp. 2d at 654.

## III.   Cathay’s Motion

Cathay seeks summary judgment on the following claims:

1. The 2014 Transfer was Actually Fraudulent under New York Debtor and Creditor Law ("DCL") § 276 (Count 1)
2. The 2014 Transfer was Constructively Fraudulent under DCL §§ 273, 273-a, and 275 (Count 2)
3. The 2015 Transfer was Actually Fraudulent under DCL § 276 (Count 4)
4. The 2015 Transfer was Constructively Fraudulent under DCL § 275 (Count 5)
5. The 2016 Transfer was Actually Fraudulent under DCL § 276 (Count 7)
6. The 2016 Transfer was Constructively Fraudulent under DCL §§ 273, 273-a, 275, and New York's LLC Law (Count 8)
7. That 26RoadAstoria LLC Is Not a Bona Fide Encumbrancer and That the Capital Mortgage is Null and Void (Count 11)
8. That Aphis Is Not a Bona Fide Encumbrancer and That the Aphis Mortgages are Null and Void (Count 12)
9. Attorney Fees for Actually Fraudulent Conveyances (Count 10)[11]

## A.  2014, 2015, and 2016 Transfers as Fraudulent Conveyances

"New York law contemplates that a transaction may be either actually or constructively fraudulent." *Knopf v. Phillips*, 802 F. App'x 639, 642 (2d Cir. 2020).  Here, Cathay asserts that the 2014 and 2015 conveyances of the Astoria Property and the 2016 conveyance of 1847 Astoria LLC were both constructively and actually fraudulent.[12]

### 1.  Constructive Fraud

A conveyance is constructively fraudulent under the relevant DCL provisions when it is made 1) without fair consideration and 2) by a person who meets at least one of the following criteria: (a) is insolvent or will, by the transfer, be rendered insolvent (DCL § 273); (b) against whom an action is pending or a judgment has been docketed for money damages (DCL § 273-a);

---

[11] Cathay has withdrawn its request for summary judgment on its Thirteenth Count for a finding of a fraudulent scheme to deprive Cathay Bank of rights as creditor.  *See* Minute Entry for Oral Arguments dated July 21, 2023.

[12] Although New York has amended its Debtor and Creditor Law effective April 4, 2020, I apply the version of §§ 273, 273-a, 275, and 276 in effect at the time of the allegedly fraudulent conveyances.  The new law does not apply to a transfer made before the Act's effective date.  *See Ray v. Ray*, 799 F. App'x 29, 31 n.1 (2d Cir. Jan. 23, 2020).

or (c) believes he or she will incur debts beyond his or her ability to pay (DCL § 275).  Specifically,

DCL § 273 provides:

> Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.

DCL § 273-a provides:

> [e]very conveyance made without fair consideration when the person making it is a defendant in an action for money damages or a judgment in such an action has been docketed against him, is fraudulent as to the plaintiff in that action without regard to the actual intent of the defendant if, after final judgment for the plaintiff, the defendant fails to satisfy the judgment.

Finally, DCL § 275 provides:

> Every conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors.

### 2.  Actual Fraud

Actual fraud under § 276 requires a conveyance made with intent on the part of the transferor to hinder, delay, or defraud either present or future creditors.  *See*, *e.g.*, *In re Sharp Int'l Corp*, 403 F.3d 43, 56 (2d Cir. 2005).  A conveyance made with actual intent to defraud is a fraudulent conveyance "regardless of the adequacy of consideration given." *Id*.  Specifically, DCL § 276 states:

> Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors.

As actual intent is rarely shown by direct evidence, courts look to "badges of fraud" when analyzing a claim under § 276.  *In re Sharp Int'l Corp*, 403 F.3d at 56.  Badges of fraud are

16

"circumstances so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent."  *In re Trib. Co. Fraudulent Conv. Litig.*, 10 F.4[th] 147, 160 (2d Cir. 2021), *cert. denied sub nom. Kirschner v. FitzSimons*, 212 L. Ed. 2d 18 (2022).

Badges of fraud may include:

(1) a close relationship between the parties to the transaction,

(2) a secret and hasty transfer not in the usual course of business,

(3) inadequacy of consideration,

(4) the transferor's knowledge of the creditor's claim and his or her inability to pay it,

(5) the use of dummies or fictitious parties, and

(6) retention of control of the property by the transferor after the conveyance.

*See Fed. Nat. Mortg. Ass'n v. Olympia Mortg. Corp.*, No. 04-CV-4971 (NG) (MDG), 2013 WL 417352, at *11 (E.D.N.Y. Jan. 29, 2013).  Courts also look to, among other factors, "the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors" and "the general chronology of the events and transactions under inquiry."  *In re TransCare Corp.,* No. 21-CV-2547, 2023 WL 5523719, at *11 (2d Cir. Aug. 28, 2023).

 "While the presence or absence of one badge of fraud is not conclusive, the confluence of several can constitute conclusive evidence of an actual intent to defraud, absent significantly clear evidence of a legitimate supervening purpose."  *Id*. at *11 (internal quotations omitted).

### 3.  Fair Consideration

Whether considering actual or constructive fraud, fair consideration requires that: 1) the recipient of the debtor's property either conveys property in exchange or discharges an antecedent

debt in exchange; 2) the exchange be a fair equivalent of the property received; and 3) the exchange be in good faith. *See Ray,* 799 F. App'x at 31.  DCL § 272 defines fair consideration as:

> a. When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or

> B.  When such property, or obligation is received in good faith to secure a present advance or antecedent debt in [an] amount not disproportionately small as compared with the value of the property, or obligation obtained.

"[W]hether the transaction is made in good faith" is "an obligation that is imposed on both the transferor and the transferee." *Sardis v. Frankel*, 113 A.D.3d 135, 142 (1st Dept. 2014) (internal quotations omitted).  "The general rule in New York is that a defendant need have only actual or constructive knowledge of the fraud in order to lack good faith." *Knopf*, 802 F. App'x at 643.

### 4.  2014 Transfer

#### a.  Constructive Fraud

Cathay argues that the 2014 Transfer of the Astoria Property from George to Paula was constructively fraudulent under DCL §§ 273, 273-a, and 275.

There is no dispute that George transferred his 50% interest in the Astoria Property to Paula and that she benefitted from the transaction by becoming the full owner.  The value of the Astoria Property at the time of the 2014 Transfer was $1,050,000.00.  Defendants do not dispute this or provide evidence of any alternative value.

Cathay adduced evidence that Paula did not convey property in exchange for the transfer, including that, at the time of the transfer, in exchange for receiving George's 50% interest, she paid zero dollars in transfer tax and that The Real Property Transfer Report filed with the Deed indicates a sale price of $0.00.  Also, George testified at his deposition that he did not receive any tangible benefit in exchange for making this transfer.

Defendants do not dispute this evidence but contend that the transfer was made pursuant to an antecedent debt because George was "legally obligated to transfer the Astoria Property to Paula pursuant to the legally operable written Separation Agreement" "made almost three years before [Cathay's] foreclosure action."  The problem with this argument is that the plain text of the Agreement does not recite any consideration for the transfer.  No fair consideration exists when the transfer is predicated on a previous agreement between parties which "does not recite any consideration for the transfer, and there is no evidence that the [transferee] even partially performed her portion of the bargain struck in [the agreement]." *Piccarreto v. Mura*, 51 Misc. 3d 1230(A), 2016 WL 3201863, at *8 (N.Y. Sup. Ct., Monroe Cty., 2016), *aff'd*, 158 A.D.3d 1095 (4th Dept. 2018).  Although the *Piccarreto* court was evaluating a prenuptial agreement, not an agreement between parties never married, the same reasoning applies here.  The Agreement provides that the Baldwin Property was to be "promptly" placed on the market and sold, which the parties agree never occurred, and that Paula would change her last name back to Roldan, although tax documents indicate she continued to file under the name Malliarakis.  In addition, because this transfer was made three years after the Agreement's execution, the transfer cannot reasonably be construed to have been made in accordance with the Agreement's express language which requires it take place "simultaneously" with the Agreement's execution.

Finally, Defendants argue that, as consideration for the Agreement, Paula, "among other things," "agreed to forgo any claims she might have had to other property owned by George," and they note that such released claims would include any claims against 458 Corp. related to the Baldwin mortgage.  However, Defendants provide no evidence that any actual claims existed, do not explain what is meant by "among other things" that Paula gave up, and do not offer evidence or even any suggestion as to what the value of any possible claims would have been.  *See BSL*

*Dev. Corp. v. Aquabogue Cove Partners, Inc.,* 212 A.D.2d 694, 695–96 (2nd Dept. 1995). Because George and Paula were never married, no alimony or marital support was owed. Indeed, the Agreement explicitly provides in its Whereas Clauses that "there is no legal right or obligation in either party regarding financial obligations, including income, expenses, assets, liabilities, and assets transferred[.]" Were the Agreement ambiguous, which it is not, the Whereas clause would confirm this conclusion. *See*, *e.g., RSL Commc'ns, PLC v. Bildirici*, No. 04-CV-5217 (RJS), 2010 WL 846551, at *4 (S.D.N.Y. Mar. 5, 2010) (although under New York law a 'whereas' clause cannot be used to create substantive rights not found in the contract's operative clauses, it can be used to clarify the meaning of an ambiguous contract).

Defendants' argument that there might have been some kind of consideration, such as a prior debt, is pure speculation and insufficient to defeat summary judgment based on the undisputed evidence that there was a sale price of zero dollars, zero dollars paid in transfer taxes, George's testimony that he received no "tangible" benefit in exchange for the transfer, and the lack of representation in the Agreement itself that there would be any consideration. With Plaintiffs having met their burden and Defendants not having provided any rebuttal evidence, no reasonable jury would conclude that fair consideration was made for this transfer.

Finally, the undisputed facts establish George's insolvency, as well as an action pending against him for money damages. "[I]nsolvency 'is presumed when a conveyance is made without fair consideration, and the burden of overcoming such presumption is on the transferee.'" *Integrity Elecs., Inc. v. Garden State Distributors, Inc.,* No. 14-CV-3197 (BMC), 2016 WL 3637004, at *9 (E.D.N.Y. June 30, 2016) (quoting *United States v. Watts,* 786 F.3d 152, 165 (2d Cir. 2015)). Such is the case here. Defendants do not present any evidence that George was solvent at the time of the transfer. *See, e.g., Piccarreto*, 2016 WL 3201863, at *8. Moreover, it is undisputed that, at

the time of the 2014 transfer, George had been served as a Defendant in the *Asia Bank* case, which sought foreclosure of the Baldwin Property and a deficiency money judgment against him.  At the time, George had also not paid off any of the prior judgments against him, nor has he since satisfied in full the final judgment ultimately entered against him in the *Asia Bank* case.

For the foregoing reasons, Cathay has demonstrated by clear and convincing undisputed evidence that the 2014 Transfer was constructively fraudulent under both § 273 and § 273-a as a matter of law.[13]

### b.  Actual Fraud

Undisputed badges of fraud establish by clear and convincing evidence that George's transfer to Paula in 2014 was also actually fraudulent.

The transfer was made for no consideration.  The transfer was made in haste: George made the transfer just one month after he was named as a Defendant in a lawsuit for money damages, despite three years having passed since the Agreement was signed in which time he had not made the transfer.  George had knowledge of the lawsuit against him at the time the transfer was made, and the record of his financial condition demonstrates that he was insolvent.

In addition, the transaction was not made at arms-length, but rather between two parties—George and Paula—who had held themselves out as husband and wife for decades.  Defendants argue that the relationship between George and Paula was "antagonistic" at the time of the transfer and that this creates an issue of fact that bars summary judgment.  But any issue of fact as to the exact nature of their relationship is immaterial.  The Supreme Court has observed that the "widely (universally?) understood definition of an arm's-length transaction" is "a transaction conducted as

---

[13] Cathay also brings a claim under § 275.  As Cathay has met its burden to set aside the transfer pursuant to both §§ 273 and 273-a, I need not determine if this transfer is also fraudulent under § 275.

though the two parties were strangers." *U.S. Bank Nat. Ass'n ex rel. CW Capital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*, – U.S. –, 138 S. Ct. 960, 967–68 (2018) (citing Black's Law Dictionary 1726 (10th ed. 2014)).  *See also Techno-Comp, Inc. v. Arcabascio*, 130 F. Supp. 3d 734, 745 (E.D.N.Y. 2015) (flip side of close relationship is parties dealing at arm's length).  Here, it is undisputed that George and Paula had known one another for over thirty years at the time of the transfer and for most of that time lived together and held themselves out as husband and wife. Whether their relationship at the time of the transfer was friendly or antagonistic, they undisputedly were not acting as strangers. Based upon the undisputed facts, the transfer was not made at arms-length.

The existence of multiple badges of fraud in this transfer constitutes clear and convincing evidence of actual intent to defraud.  The transaction was not made at arms-length but rather between two people with a history of a very close relationship; the transfer was made for no consideration; the transfer was not made in the usual course of business but rather in haste just one month after the transferor was named as a Defendant in a lawsuit for money damages; and the transferor had incurred significant debt and financial difficulties, including the lawsuit by a creditor, in the years leading up to the transfer.  Thus, the 2014 transfer was not only constructively fraudulent, but also actually fraudulent.

### 5. 2015 Transfer

#### a. Constructive Fraud

Cathay claims that the 2015 Transfer of the Astoria Property from Paula to 1847 Astoria as a condition of the Capital loan was constructively fraudulent under DCL § 275.  DCL § 275 requires proof of the debtor's subjective intent or belief that it will incur debts beyond its ability to pay as they mature, even though actual intent does not need to be proven.  *See In re Chin*, 492

B.R. 117, 129 (Bankr. E.D.N.Y. 2013).  This subjective intent or belief is interpreted as awareness by the transferor that she or he will be unable to pay present and future debts as a result of the conveyance.  *See id.*  Here, Cathay has met its burden to prove constructive fraud.

No consideration was paid for this transfer.  Cathay produced a Real Property Transfer Report which shows a sale price for the property of $0.00, and no evidence to the contrary has been produced.[14]  In addition, this transfer was made in conjunction with a loan for which the record establishes that Paula unequivocally understood that she would be incurring a debt beyond her ability to pay.  She was already in debt.  In the months preceding the December 2, 2015 transfer, Paula twice filed for bankruptcy.  In her April 2015 petition, she assessed her assets at the time to be less than $50,000 and her liabilities to be between $100,001 and $500,000; she also asserted a monthly income of $4,166, but monthly expenses of $9,076.  Thus, she explicitly acknowledged her liabilities and expenses as already greater than her assets and income.

Then, in her August 2015 petition, Paula claimed to own assets worth $2,521,479.00, with liabilities of $1,960,191.48; however, $1.5 million of those assets are the Baldwin Property, on which there was a judgment of foreclosure.  Therefore, subtracting the Baldwin Property, Paula believed she had $938,712.48 more in liabilities than assets ($1,021,479 in assets as compared with liabilities of $1,960,191.48).  Although Paula's August 2015 filing shows that her assessment of her income and expenditures changed from the April 2015 filing, she continued to report liabilities she would be unable to repay based on her reported assets and income.  In this August 2015 filing, she assessed her monthly income to be only $5,966.00, with monthly expenditures of $2,987.00, and she explicitly did not expect an increase or decrease in income or expenditures

---

[14] Mortgagee Defendants assert that whether Paula received fair consideration for the 2015 Transfer is an issue of fact but provide no evidence to raise such an issue. *See supra* n. 5.

within the year after filing.  Paula's net monthly income was thus only $2,979, without accounting for the need to make payments on her significant liabilities.[15]  Paula's bankruptcy filings provide clear and convincing evidence of her subjective beliefs with respect to her financial status and correspondingly her inability to pay her debts.

It was against this backdrop that she entered into the Capital loan, which had a very high annual interest rate of 10%, required Paula to pay associated expenses (including, among other things, prepaid interest of $45,667.58), and imposed a balloon payment for the full principal amount of $600,000 less than a year later.  Given her financial status and the two bankruptcy filings made in 2015, Paula clearly knew she would not be able to pay off the significant debt incurred by this loan.  Therefore, Cathay has established by undisputed clear and convincing evidence that the 2015 Transfer was constructively fraudulent under § 275.

### b.  Actual Fraud

The 2015 Transfer also presents numerous badges of fraud sufficient to establish actual fraud in the transfer.  The transfer was made for no consideration, as described above.  The transfer occurred following a series of transactions evidencing Paula's financial difficulties, including two bankruptcies and a foreclosure on the Baldwin Property.  Further, there is no dispute that Paula wholly owned 1847 Astoria LLC, and that she continued to retain the benefit of the Astoria Property after its transfer.  *See In re Kaiser*, 722 F.2d 1574, 1583 (2d Cir. 1983) ("[t]he shifting of assets by the debtor to a corporation wholly controlled by him is [a] badge of fraud.").[16]  .

---

[15] In addition, in its November 3, 2015 dismissal of her second bankruptcy petition, the court ordered, among other things, that she pay to Cathay $9,000 per month for use and occupancy of the Baldwin Property up to two months.  This order mandated yet another debt she would incur if she chose to remain living in the Baldwin Property (which she did).

[16] Mortgagee Defendants argue that no preexisting relationship between Paula and Capital existed, but the transfer was made between Paula and 1847 Astoria LLC, not Capital, and therefore whether

Defendants urge that the transfer was a "condition precedent" to the Capital loan and "not a ruse perpetrated by Paula[.]"  Opp. of 1847 Astoria LLC, Kaliampos, and Pistikos at p. 9.  The parties do not dispute that the transfer was made as a condition of the loan.  However, that fact does not negate the existence of actual fraud in the transaction.  Nor is it material whether it is industry standard for private equity lenders to demand such a transfer.  Capital's motivation to demand the transfer was to isolate the property from present and future creditors.  The undisputed evidence demonstrates that Paula acquiesced in this demand and thus assented to a transfer knowingly made for the purpose of isolating the property to the detriment of her other creditors, whom she knew existed at the time of the transfer.[17]  Intent to hinder or delay creditors, even if temporary, is adequate for a finding of actual fraud.  *See In re TransCare Corp.,* 2023 WL 5523719 at *12.

Given the foregoing, no reasonable juror could conclude other than that the circumstances surrounding the 2015 transfer establish by clear and convincing evidence that it was made with actual intent to hinder, delay, or defraud creditors.

### 6.  2016 Transfer

#### a.  Invalidity of Transfer under New York's Limited Liability Company Law

New York law provides that "[a] person can become a member of a limited liability company by assignment, but only where the operating agreement grants the assignor such power, and, then, where the conditions of such authority have been complied with (see Limited Liability

---

a close relationship existed between the parties to the transfer is determined based on Paula's relationship with 1847 Astoria LLC, of which she was the sole owner, not her relationship to Capital.

[17] Notably, Paula's Estate does not oppose summary judgment and thus introduces no evidence on this issue.

Company Law § 602 [b] [2]).ˮ  *Behrend v. New Windsor Grp., LLC*, 180 A.D.3d 636, 639 (2nd Dept. 2020).

Here, 1847 Astoria LLC's Single-Member Operating Agreement prohibited Paula from transferring her membership interest in 1847 Astoria LLC.  It states that "[n]o Member may Voluntarily Transfer all or any portion of, or any interest or rights in, the Membership Interest owned by the Member" and that "the voluntary Transfer of any Membership Interests, including Economic Interests, in violation of the prohibition contained in this Section 7.1 shall be deemed invalid, null and void, and of no force or effect."  Pl. Exh. 71, § 7.1.  Defendants do not dispute the validity of this agreement.  Nor do they argue that New York's Limited Liability Company Law does not apply.  "[A] partial response arguing that summary judgment should be denied as to some claims while not mentioning others may be deemed an abandonment of the unmentioned claims."  *Jackson*, 766 F.3d at 195.

Under *Behrend*, the transfer must be nullified and set aside. *See Behrend*, 180 A.D.3d at 640; *see also Kaminski v. Sirera*, 169 A.D.3d 785, 787 (2nd Dept. 2019). Because of this, I need not determine whether the transfer is also constructively fraudulent under the DCL; I will, however, address actual fraud in light of Cathay's request for attorneys' fees.

### b. Actual Fraud

Cathay argues that the October 19, 2016 Transfer was actually fraudulent under DCL § 276.  Most importantly, the undisputed facts establish that there was no fair consideration for this transfer.  The amount exchanged for the Astoria Property was neither (1) a fair equivalent to its value nor (2) made in good faith.  The parties do not dispute that the fair saleable value of the Astoria Property at the time of the 2016 Transfer was $1,075,000.  There is likewise no dispute that, in exchange for the transfer, Kaliampos assumed the three mortgages on the Astoria Property,

the cumulative value of which was $705,000.  The Membership Sale Agreement through which the 2016 Transfer was made states that Kaliampos "[took] title subject to and assuming payment of" the mortgages.  It is also undisputed that Pistikos paid Paula an additional $80,000 around the time of the transfer although these additional funds were not part of the written sale agreement.

Although Cathay argues that the value of the mortgages should be deducted from the property value in calculating the value of the exchange, the Second Circuit has made clear that "assumption of and agreement to pay [mortgages] constitutes tangible consideration under New York law."  *United States v. McCombs*, 30 F.3d 310, 325 (2d Cir. 1994).  There, the court determined that a lower court had erred in its calculation of fair consideration when it incorrectly noted that transferees had taken property subject to a mortgage, rather than in assumption of a mortgage.  The former would be deducted from the property value, but the latter would not.  Here, therefore, the mortgages assumed are not deducted from the value of the property.

Cathay contends that the $80,000 Pistikos paid to Paula was "under the table" and notes that it was not required by the Membership Sale Agreement.  However, the record establishes that this payment was made specifically in connection with the transfer of 1847 Astoria LLC.  *See* Pistikos Dep. at 209:15–24.  Cathay itself admits that "Pistikos provided to Paula in connection with the transfer, although not required by the Membership Sale Agreement payments either to her in cash or to a third party at her direction, in a total amount of $80,000" and that "Pistikos was told "Paula was insisting on being paid $80,000 in cash in connection with the 2016 Transfer."  Pl. Rule 56.1 Statement of Undisputed Facts ¶¶ 227–28.

Construing the evidence in the light most favorable to Defendants as non-moving parties, I calculate the value of the amount exchanged as the sum of the mortgages assumed and the

$80,000 Pistikos paid to Paula in conjunction with the transfer.[18]  Thus, the total paid to Paula was the $705,000 in mortgage assumptions plus $80,000, or $785,000—just 73% of the value of the property.  While neither "mathematical precision nor a penny-for-penny exchange is required" to show fair equivalent value, *Allstate Ins. Co. v. Mirvis*, No. 08-CV-4405 (SLT) (PK), 2017 WL 3981157, at *4 (E.D.N.Y. July 31, 2017), report and recommendation adopted, 2017 WL 3981297 (E.D.N.Y. Sept. 8, 2017), an exchange worth only 73% of the property value is clearly disproportionate as it represents a significantly smaller amount than the undisputed full value of the property.

Cathay has also demonstrated a lack of good faith by both Paula and Pistikos in this transaction.  Fair consideration requires not only that the amount exchanged for property is of a fair equivalent value, but also that "the transaction is made in good faith, an obligation that is imposed on both the transferor and the transferee."  *Sardis,* 113 A.D.3d at 142 (internal quotation marks omitted).  Cathay's $455,000 money judgment against Paula was docketed on May 11, 2016, and both Paula and Pistikos had knowledge of this judgment.  "Where the transferor has knowledge of a judgment, the transfer of funds available to satisfy the judgment made at the

---

[18] Defendants also claim that Pistikos spent $265,000 on capital improvements to the Astoria Property following the close of title which should constitute part of the consideration.  However, Defendants offer no evidence that any such payments were contemplated as part of the sale negotiations, were made pursuant to the sale agreement or in conjunction with the sale, or that Paula received any benefit from them.  Thus, any post-closing expenditures on the property are not properly considered as part of consideration for the transfer.

Pistikos also contends in his affidavit that the consideration for the transfer should include: the $662,500 he paid in August 2016 through 26RoadAstoria LLC to be assigned the Capital Mortgage, the March and August 2016 Aphis mortgage loans of $75,000 and $30,000, respectively, as well as "other monies [Paula] owed such as brokerage commissions, legal fees and open Real Estate Taxes."  Pistikos Aff. ¶ 8.  This contention is meritless.  These payments were not part of the consideration for the 2016 Transfer by Paula of 1847 Astoria LLC to Kaliampos as a front man for Pistikos.  That Pistikos made other payments in his efforts to acquire the Astoria Property does not render those payments consideration for the acquisition of 1847 Astoria LLC.

judgment debtor's direction will be set aside as lacking in good faith. Likewise, where the transferee is aware of an impending enforceable judgment against the transferor, the conveyance does not meet the statutory good faith requirement." *Id.* (internal citation omitted).

Here, Cathay produced emails from May 18, 2016, on which Pistikos' attorney, John Mincone, was copied. Defendants do not dispute that in these emails the issue of this judgment "was discussed among the title agent and counsel, including Mincone." Defendants' Joint Counter Statement of Undisputed Material Facts at ¶ 192. Because Mincone had notice of this judgment, so too did Kaliampos and Pistikos.[19] "It is well established . . . that an attorney retained either for litigation or to represent a party in the course of a transaction is that party's agent." *Rai v. WB Imico Lexington Fee, LLC,* 802 F.3d 353, 360 (2d Cir. 2015). "[A] person has notice of a fact if his agent has knowledge of the fact, reason to know it or should know it, or has been given a notification of it." *Id.* (internal citation omitted). This is true even if the information may never actually have been communicated to the principal. *See Emigrant Bank v. Commonwealth Land Title Ins. Co*., No. 15-CV-7593 (KMK), 2017 WL 4286335, at *7 (S.D.N.Y. Sept. 26, 2017).

Defendants have not offered evidence to the contrary. Pistikos only:

> categorically states that he had absolutely no knowledge whatsoever that any transfers of or relating to the property, whether by Paula alone, or between Paula and her so-called 'husband' defendant, [George Malliarakis], made in 2014 and/or 2015, were possibly what are deemed 'fraudulent conveyances,' in or about October, 2016, when [Pistikos], by and through [Kaliampos], funded the purchase of Paula's membership interest in and to 1847 Astoria LLC, which was the then record fee owner of the property.

Pistikos Aff. ¶ 6. Nowhere does Pistikos specifically dispute knowledge of the May 2016 money judgment against Paula.

---

[19] There is no dispute that Mincone represented Kaliampos in conjunction with the 2016 Transfer; further, there is no dispute that Kaliampos was acting as a front man and agent for Pistikos in the 2016 transfer.

Looking to additional badges of fraud, the events leading up to this transfer clearly establish that it occurred as part of a series of transactions in which Paula, as the transferor, incurred debt or recognized that she was facing financial difficulties: she twice filed for bankruptcy in 2015; she took out a problematic loan in December 2015; a company she solely owned took out multiple Aphis Realty, Inc. loans in 2016; and a $455,000 money judgment was entered against her in May 2016. The chronology of these events, as well as Paula's financial condition at the time of the transaction in question, are significant indicia of Paula's fraud as against her creditors in transferring 1847 Astoria LLC. Further, there is no dispute that Pistikos used Kaliampos to act as a front man for him in the transfer, demonstrating yet another badge of fraud in the transaction.

Given the totality of the circumstances, Cathay has adduced undisputed clear and convincing evidence of actual fraud in the 2016 Transfer.

## B. Bad Faith Encumbrances

Cathay also seeks summary judgment on its claims to set aside the Aphis Realty, Inc. and 26RoadAstoria LLC mortgages on the ground that the two entities are bad faith encumbrancers whose interests in the Astoria Property are not entitled to protection under New York's Real Property Law § 266 because they had notice of underlying fraud affecting the property's title. Section 266 provides the following:

> This article does not in any manner affect or impair the title of a purchaser or incumbrancer for a valuable consideration, unless it appears that he had previous notice of the fraudulent intent of his immediate grantor, or of the fraud rendering void the title of such grantor.

"A mortgagee's interest in the property is not protected if the mortgagee had notice of a previous fraud affecting the title of its grantor." *Feggins v. Marks*, 171 A.D.3d 1014, 1016 (2nd Dept. 2019) (internal citations omitted). "[I]f a purchaser or encumbrancer knows facts that would 'excite the suspicion of an ordinarily prudent person' and fails to investigate, the purchaser or encumbrancer

will be chargeable with that knowledge which a reasonable inquiry, as suggested by the facts, would have revealed." *Booth v. Ameriquest Mortg. Co.*, 63 A.D.3d 769, 769 (2nd Dept. 2009) (internal citations omitted). "A mortgagee who fails to make such an inquiry is not a bona fide encumbrancer for value." *Feggins*, 171 A.D.3d at 1016.

### 1. Capital, and its Assignee, 26RoadAstoria LLC, are Not Bona Fide Encumbrancers

Cathay argues that 26RoadAstoria LLC's assignor, Capital, had actual knowledge, or recklessly disregarded knowledge that the 2014 and 2015 Transfers were fraudulent conveyances when it provided the $600,000 loan secured by a mortgage on the Astoria Property. Because an assignee stands in the shoes of the assignor and takes the assignment subject to any preexisting liabilities, if Capital is not a bona fide encumbrancer, neither is its assignee 26RoadAstoria LLC. *See WMC Mortg. Corp. v. Vandermulen*, 204 A.D.3d 865, 866 (2nd Dept. 2022).

There is no dispute that, prior to making its loan, Capital had actual knowledge of the following: that Paula had twice filed for bankruptcy in 2015; that the title search it obtained showed that the 2014 Transfer of the Astoria Property to Paula had been without consideration; and that a credit report it obtained showed Paula had over $150,000 in debt and that twelve of her accounts had recently been in collection.

"A mortgagee is under a duty to make an inquiry where it is aware of facts that would lead a reasonable, prudent lender to make inquiries of the circumstances of the transaction at issue." *WMC Mortg. Corp.*, 204 A.D.3d at 866 (internal quotations omitted). Defendants claim there is an issue of fact and a "battle of experts" with respect to whether, given its notice of the aforementioned facts, Capital was required to, and in fact did, undertake a sufficient inquiry. However, a close review of the expert reports and the experts' deposition testimony belies this proposition and shows that any dispute between the experts is immaterial.

In essence, Defendants' position is that, within the "niche" world of high-risk private equity loans in which the lender imposes extremely high interest rates and other demanding conditions, the inquiry that lenders need to engage in, to be sure that their loans are protected financially, is the same inquiry necessary to meet the standards of Section 266. Put another way, it argues that because Capital, to financially protect its loan, engaged in an inquiry appropriate within its niche industry, its interests are protected under Section 266. However, that is not the case. The purpose of Section 266 is not to assure a lender that its loan will be repaid. Its purpose is to protect an encumbrancer from losing its interest in property where it has done the due diligence sufficient to establish its good faith. If it meets that standard, it will be protecting others in the chain of title and be entitled to Section 266 protection. Capital, as a high-risk lender, did not need to engage in much inquiry in order to protect its loan from the risk of non-repayment because the conditions it imposed on the loan assured its ultimate profitability. The inquiry it conducted, which its private equity lending expert Marc Schulder opines was sufficient under industry standards to protect its loan, was not the same as the inquiry it needed to conduct in order to be a good faith encumbrancer for value.

Defendants' experts do not raise a genuine dispute of material fact on this issue. First, Plaintiff's private equity lending expert, William Barone, opines that "a reasonably prudent private equity lender, in 2015 and 2016 as well as today, would have asked a loan applicant, such as [Paula], about personal bankruptcies, judgments against the applicant, foreclosures against the applicant, and pending legal actions against the applicant . . . [m]inimally, the private equity lender would investigate further [any of these circumstances if present]." Barone Decl. ¶ 2. Marc Schulder likewise testified that inquiring about bankruptcies, judgments, and obligations is "a pretty universal background search for any lender" including private equity lenders. Schulder Dep.

at 24:15–22.  He also stated that, if a bankruptcy were closed, a private equity lender would "probably" want to know how the bankruptcy had been closed and the lender would probably ask for any orders closing the case.  *Id.* at 60:7–17.  The views of Barone and Schulder on this point are consistent.

It is undisputed that Capital did not inquire into Paula's bankruptcy filings.  Had Capital done so it would have had access to documents alerting it to Paula's financial situation and debts in 2015 (detailed above) including the Baldwin Property Foreclosure Action.  That action was instituted against George and Paula, seeking foreclosure of the Baldwin Property and a deficiency money judgment against George (who was already in significant debt) just one month before the 2014 transfer, and judgment was entered in favor of Cathay in October 2014 holding that $1,282,381.67 was owed to Cathay on the Baldwin Mortgage and authorizing an auction of the Baldwin Property.  These facts would have put Capital on notice of a possible fraud affecting the title of the Astoria property.

As Barone opines, "a reasonably prudent private lender would have learned of the Foreclosure Action" and "would also have reviewed the entire files in both the Foreclosure Action and Paula's bankruptcies."  Barone Decl., ¶¶ 4–5.  Plaintiff's title expert, Howard Kei, likewise opines that "Capital was on constructive and inquiry notice requiring the review of Plaintiff's motions to lift the bankruptcy stays in the bankruptcy cases Paula filed."  Kei Decl., ¶ 3.  Defendants rely on the Schulder report to rebut this, but Schulder simply states in his report that "[b]ecause the bankruptcies were dismissed, there was no particular additional risk to the lender as a result of those specific bankruptcy filings[.]"  Schulder June 25, 2021 Report at p. 9.  Schulder's statement does not contradict his own and Barone's views that typical private equity lenders would have made further inquiries into the bankruptcies.  Rather, his statement reflects

only an opinion pertaining to Capital's business decision to make the loan despite what may have been in any filings; it does not raise a genuine dispute of material fact.

In addition, although Capital had a copy of the 2011 Agreement between George and Paula and knew that the title search it obtained via Fidelity Insurance showed that the 2014 Transfer of the Astoria Property to Paula had been without consideration, it did not conduct further inquiry into this Transfer and instead relied on Fidelity's willingness to indemnify the title.  As a prospective mortgagee, because Capital was aware of a transfer without consideration in the Astoria Property's chain of title, it should have inquired about other indicia of a possible fraudulent conveyance.  *See In re Altmeyer*, 268 B.R. 349, 353–56 (Bankr. W.D.N.Y. 2001) (where mortgage was issued to an individual who had received a deed transfer from his wife which explicitly stated no consideration, such a statement of record within the chain of title gave notice of an obligation to inquire about the other requisites for lien avoidance).

Kei stated that, in addition to the bankruptcy petitions, the 2014 and 2015 transfers without consideration were "circumstances [which] presented notice of possible fraudulent conveyances and should have led to a more extensive inquiry into the aforesaid transfers." Kei Decl. ¶ 2. According to Defendant's own expert, Schulder, Capital relied on Fidelity, its title insurance company, to support its acceptance of the 2014 transfer.  *See* Schulder Dep.  108:2–21.  The title reader's notes show that the company spoke with Jim Dimitriou, counsel for George during the 2014 Transfer.  After describing the information Fidelity reflected in its notes from this conversation, Defendant's title expert, Joseph Friedman, opined that "the inquiry by Fidelity reflected in these notes was sufficient for it to omit the exception for the 2014 transfer from the Commitment." Friedman Decl. at p. 7.  However, this opinion does not create a genuine issue of material fact with respect to whether Capital sufficiently inquired as to the fraudulent nature of the

2014 transfer because it is limited to whether Fidelity, the title insurer, not Capital, the lender, acted properly.

Fidelity, as a title insurance company, necessarily inquired into the Transfer for its own purposes relevant to indemnification.  Title insurance is, essentially, a contract through which a title insurer agrees to indemnify the insured for loss caused by a defect in title.  *See Fawn Second Ave. LLC v. First Am. Title Ins. Co*., 610 F. Supp. 3d 621, 629 (S.D.N.Y. 2022).  Whether a title insurer believes it to be in its own interests to insure possible loss caused by a title defect is a consideration distinct from a lender's obligation to inquire into possible fraud in the title of a property securing its mortgage loan. Defendants have provided no legal ground on which Capital can rely on Fidelity's issuance of title insurance as a substitute for its own due diligence.  It is undisputable that further inquiry into the circumstances surrounding the 2014 Transfer would have alerted Capital to the various indicia of fraud, including George's insolvency and the lack of consideration.

Schulder concludes in his report that "the due diligence and underwriting performed by [Capital] in connection with the loan and mortgage to 1847 Astoria LLC were consistent with industry standards to adequately understand the economics of the transaction and the risk of this loan." Schulder June 25, 2021 Report at p. 10.  But this opinion relates only to whether Capital made an appropriate business decision as a private equity lender in a niche business of making high-risk loans.  He never opines that Capital engaged in the due diligence of a reasonably prudent lender so that its interests in the property can be protected over those of other creditors under Section 266.  Defendants offer no legal support for their position that a lender that deliberately— and at great profit to itself—makes a high-risk loan is entitled to Section 266 protection in the absence of the due diligence required of a reasonably prudent lender.

Based upon all of the above, Cathay has clearly and convincingly established that Capital knew facts which would lead a reasonable, prudent lender following industry standards to make inquiries that it failed to do, and thus is considered to have had knowledge of the facts such an inquiry would have revealed, which in this case clearly indicated possible fraud in the transfer of title on the subject property.  Because it "failed to make a proper inquiry upon becoming aware of facts regarding a cloud on [the property's] title and [Paula's] inability to convey a mortgage interest," it is not a bona fide encumbrancer for value, and neither is its assignee.  *89 Pine Hollow Rd. Realty Corp. v. Am. Tax Fund*, 96 A.D.3d 995, 998 (2nd Dept. 2012).

Finally, Pistikos himself had actual notice of underlying fraud in the property beyond the inquiry notice that Capital had.  May 2016 emails on which his attorney, Mincone, were copied, specifically discussed, *inter alia*, the lack of consideration for the 2014 and 2015 transfers, Paula's filing for bankruptcy, the involuntary bankruptcy petition against George, and Cathay's money judgment against Paula.  As explained above, Mincone's knowledge can be imputed to Pistikos.  Thus, Pistikos had actual knowledge of the foregoing items.  Pistikos also knew that 1847 Astoria LLC had never made any payment on the Capital mortgage other than prepaid interest required by the loan agreement.  All of these facts would have led a reasonable, prudent lender following industry standards to make further inquiries into underlying fraud in the title.

In sum, Capital is not a bona fide encumbrancer for value and neither is its assignee, Pistikos' company 26RoadAstoria LLC.  For that reason, Plaintiff is entitled to a declaration that 26RoadAstoria LLC is a bad faith encumbrancer and that its mortgage interest is vacated and extinguished.  *See 89 Pine Hollow Rd. Realty Corp.,* 96 A.D.3d at 998–99.

### 2.  Aphis Realty, Inc. is Not a Bona Fide Encumbrancer

Aphis Realty, Inc., of which Pistikos is the principal, made two loans to 1847 Astoria LLC in exchange for mortgages on the Astoria Property, one each in March and August 2016.  It is undisputed that, prior to the first Aphis loan, Aphis obtained: 1) a Title search which showed actual knowledge of the no consideration deed from the 2015 Transfer, and 2) a bankruptcy search for 1847 Astoria LLC (but no bankruptcy search for Paula or George).  Pistikos testified that Aphis Realty, Inc. did not "have any procedures to ascertain the credit worthiness of a borrower." Pistikos Dep.at 35:2-5.  For substantially the same reasons identified in the previous section, Aphis Realty, Inc. is likewise not a bona fide encumbrancer for value.  Therefore, Plaintiff is entitled to a declaration that Aphis Realty, Inc. is a bad faith encumbrancer and that its mortgage interest is vacated and extinguished.  *See 89 Pine Hollow Rd. Realty Corp.,* 96 A.D.3d at 998–99.

### C.  Attorneys' Fees from Actually Fraudulent Conveyances

Cathay seeks attorneys' fees under DCL § 276-a.  "Section 276-a provides for recovery of attorneys' fees if a 'conveyance is found to have been made by the debtor and received by the transferee with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud present or future creditors.'"  *In re Kellel*, No. 8-18-76679 (LAS), 2022 WL 24057, at *4 (Bankr. E.D.N.Y. Jan. 3, 2022) (quoting DCL § 276-a).[20]  Under DCL § 276-a, "to prevail on a

---

[20] DCL § 276-a provides: "In an action or special proceeding brought by a creditor, receiver, trustee in bankruptcy, or assignee for the benefit of creditors to set aside a conveyance by a debtor, where such conveyance is found to have been made by the debtor and received by the transferee with actual intent, as distinguished from intent presumed in law, to hinder, delay or defraud either present or future creditors, in which action or special proceeding the creditor, receiver, trustee in bankruptcy, or assignee for the benefit of creditors shall recover judgment, the justice or surrogate presiding at the trial shall fix the reasonable attorney's fees of the creditor, receiver, trustee in bankruptcy, or assignee for the benefit of creditors in such action or special proceeding, and the creditor, receiver, trustee in bankruptcy, or assignee for the benefit of creditors shall have judgment therefor against the debtor and the transferee who are defendants in addition to the other relief granted by the judgment. The fee so fixed shall be without prejudice to any agreement, express or

claim for attorneys' fees, plaintiff must establish actual intent by both the transferor and the transferee." *Id.* at *4 (citation omitted).

The Second Circuit has explained that, before awarding attorneys' fees against a defendant, "whether he be the debtor or the transferee, the court must make an explicit finding of actual intent to defraud[.]" *Carey v. Crescenzi*, 923 F.2d 18, 20–21 (2d Cir. 1991). Here, I have found actual intent to hinder, delay, or defraud under DCL § 276 in each of the three transfers in question. For the 2014 Transfer, not only George as transferor but also Paula as transferee had actual knowledge of the lawsuit filed one month prior against them both seeking foreclosure of their jointly owned Baldwin Property and a deficiency money judgment against George. They each knew that the transfer was not made at arms-length, that it did not occur contemporaneously with the 2011 Agreement three years earlier, and that no consideration was paid for the transfer. Thus, I find that both George and Paula had actual knowledge of the circumstances that rendered this conveyance fraudulent, and Cathay is entitled to attorneys' fees as against both George and Paula's Estate.

For the 2015 Transfers, I have previously found actual intent to defraud as against Paula as transferor, and she was also the beneficial owner of the transferee, 1847 Astoria LLC. Likewise, with respect to the 2016 Transfers, Paula as transferor and Pistikos and Kaliampos as transferees each had actual knowledge of the circumstances that rendered this conveyance fraudulent, for the reasons discussed above pertaining to their notice of the underlying fraud factors.

Therefore, summary judgment is granted to Cathay on its claim for attorneys' fees under DCL § 276-a with respect to each of the three fraudulent transfers: as against George and Paula's

---

implied, between the creditor, receiver, trustee in bankruptcy, or assignee for the benefit of creditors and his attorney with respect to the compensation of such attorney."

Estate for the 2014 Transfer; Paula's Estate and 1847 Astoria LLC for the 2015 Transfer; and Paula's Estate, Pistikos, and Kaliampos for the 2016 Transfer.

## IV.   Mortgagee Defendants' Motion

Mortgagee Defendants bring a separate motion for summary judgment on their third affirmative defense for an equitable lien pursuant to the doctrine of equitable subrogation.  For the reasons that follow, I conclude that *Plaintiff* is entitled to summary judgment dismissing this defense.[21]

"The doctrine of equitable subrogation provides that a mortgagee who pays off a prior mortgage without knowledge of the existence of an intervening lien may have its rights subrogated to the rights of the senior mortgage and thus gain priority over the intervening lien holder."  *United States v. Meiri,* No. 15-CR-627 (ER), 2021 WL 5494771, at *5 (S.D.N.Y. Nov. 23, 2021) (internal citations omitted).  It is an equitable remedy applied when "the funds of a mortgagee are used to satisfy the lien of an existing, known incumbrance when, unbeknown to the mortgagee, another lien on the property exists which is senior to his [or hers] but junior to the one satisfied with his [or her] funds."  *Elwood v. Hoffman*, 61 A.D.3d 1073, 1075 (3rd Dept. 2009) (internal citations omitted).

The purpose of equitable subrogation is "the prevention of injustice.  It is designed to promote and to accomplish justice, and is the mode which equity adopts to compel the ultimate

---

[21] Courts may grant summary judgment in favor of a non-moving party if "(1) no genuine issue of material fact is in dispute; (2) the non-moving party is entitled to judgment as a matter of law; and (3) the moving party has had an adequate opportunity to come forward with all of its evidence." *New York Marine & Gen. Ins. Co. v. Travelers Prop. Cas. Co. of Am.*, 632 F. Supp. 3d 303, 305 n.1 (S.D.N.Y. 2022) (internal citation omitted).  As discussed in the text, the first two criteria are met.  I find that the third element is also met as the parties completed discovery in this case, and the Mortgagee Defendants as the moving parties have had ample opportunity to, and in fact did, submit relevant evidence both in support of this motion as well as in opposition to Plaintiff's motion for partial summary judgment.

payment of a debt by one who, in justice, equity, and good conscience, should pay it." *Pateley Assocs. I, LLC v. Pitney Bowes, Inc*., 704 F. Supp. 2d 140, 158 (D. Conn. 2010) (internal citation omitted). "The doctrine operates to erase[ ] the lender's mistake in failing to discover intervening liens, and grants him the benefit of having obtained an assignment of the senior lien that he caused to be discharged." *Filan v. Dellaria*, 144 A.D.3d 967, 972 (2nd Dept. 2016) (internal quotations omitted). "In this manner, equitable subrogation preserves the proper priorities by keeping the first mortgage first and the second mortgage second, and prevents a junior lienor from converting the mistake of the lender into a magical gift for himself [or herself]." *Id.* (internal quotations omitted).

Mortgagee Defendants contend that they are entitled as a matter of law to an equitable lien against the Astoria Property because a portion of Capital's $600,000 Mortgage, which 26RoadAstoria LLC was assigned, was used to pay off an existing lien on the Astoria Property. It is undisputed that a portion of the $600,000 Capital Loan was used to pay off a $312,576.67 existing mortgage lien on the Astoria Property from a reverse mortgage loan that Paula had obtained and to pay $8,816.73 in taxes on the property. *See* Steven Zeikowitz Aff., February 10, 2022, ¶¶ 14, 16. The mortgage was given to Advisors Mortgage Group, LLC in January 2015 and assigned to Live Well Financial Inc. on April 21, 2015. Mortgagee Defendants argue that Cathay will have unjustly benefitted if any of the underlying transfers are set aside or the mortgage is nullified, because it will have benefited from Capital already having paid off this amount. *Id.*

Here, because Capital was actively involved in the fraudulent 2015 Transfer which was directly related to its loan secured by a mortgage on the Astoria Property, and because 26RoadAstoria LLC took assignment of that loan, both entities have participated in fraud and cannot be granted equitable subrogation. "Subrogation is only appropriate to prevent unjust

enrichment where the person seeking subrogation has performed an obligation due to misrepresentation, mistake, duress, undue influence, deceit, or other similar imposition." *Meiri*, 2021 WL 5494771 at *5. Such is not the case here.

Although constructive inquiry notice of, and negligence in failure to uncover, fraud does not alone invalidate the right to subrogate, here, Capital did more than fail to uncover fraud in the title of the property.[22] It took an active role in perpetrating fraud on the part of Paula against her creditors. By requiring that the Astoria Property be transferred to an LLC wholly owned by Paula, Capital knew that the terms of its loan would serve to isolate the property in question from present creditors, and it had actual knowledge of twelve accounts Paula had in collection at the time of the 2015 transfer and mortgage loan. It thus actively engaged in fraud. *See Crispino v. Greenpoint Mortg. Corp.,* 304 A.D.2d 608, 609–10 (2nd. Dept. 2003) ("Since Royal participated in the forgery of the deed through its principal, Mr. Crispino, the doctrine of unclean hands would bar Royal from entitlement to equitable subrogation."); *cf. Wells Fargo Bank, N.A. v. Dalfin*, 169 A.D.3d 970, 972 (2nd Dept. 2019) (summary judgment granting equitable subrogation affirmed when, in opposition, party failed to raise a triable issue of fact as to whether the plaintiff actively engaged in any fraud, had actual notice of any fraud, or had unclean hands). Because of the fraudulent transfer which Capital facilitated through its requirement that Paula transfer the Astoria Property to an LLC, Cathay, as a creditor of Paula, has been harmed by the difficulty in reaching this asset. Mortgagee Defendants' argument that it was standard industry practice to make such a requirement does not absolve Capital of its active participation in the fraudulent transfer. The situation at bar

---

[22] In New York, "[a]lthough constructive notice of a prior mortgage lien alone does not automatically bar application of the doctrine, actual notice does. The party invoking the doctrine has the burden of establishing that it lacked actual notice of the prior mortgage lien." *Matter of Kissous v. Futerman,* 217 A.D.3d 1002, 1004 (2nd Dept. 2023).

is thus distinct from *Lucia v. Goldman*, 145 A.D.3d 767, 769 (2nd Dept. 2016), on which Mortgagee Defendants rely.  There, equitable subrogation was found appropriate because the moving party failed to show that the lender, Chase Bank, was guilty of immoral, unconscionable conduct despite it being "charged with knowledge of information which would have caused a prudent lender to inquire as to the circumstances of the transaction." *Id.*  The Appellate Division found critical that the trial court "did not find that [Chase Bank] had actual knowledge of the fraud or that it did anything to actively facilitate the fraud" in question. *Id.*  Not so here, where Capital was an active participant in fraudulently transferring the Astoria Property further away from Paula's creditors.

Finally, while the foregoing is sufficient to deny equitable subrogation to Defendants, 26RoadAstoria LLC independently cannot benefit from the remedy of equitable subrogation because of its own bad faith.  As determined earlier in this opinion, Pistikos, 26RoadAstoria LLC's principal, had actual knowledge of underlying fraud in the title even beyond the inquiry notice that Capital had.  This actual notice of fraud in the title demonstrates his bad faith in acquiring the mortgage and the property and renders him ineligible for equitable relief.

Since the evidence in the record establishes that there is no genuine dispute of material fact as to equitable subrogation, summary judgment is denied to the Mortgagee Defendants and granted to Cathay.

## V.    Conclusion

For the foregoing reasons, Cathay's motion for partial summary judgment is granted.  The 2014, 2015, and 2016 Transfers will be set aside as fraudulent conveyances (Counts 1, 2, 4, 5, 7, and 8); 26RoadAstoria LLC and Aphis Realty, Inc. are found to be bad faith encumbrancers and their mortgages on the Astoria Property will be vacated and extinguished (Counts 11 and 12);  and

Cathay is entitled to attorneys' fees under DCL § 276-a pursuant to Count 10 as against George and Paula's Estate for Count 1, the 2014 Transfer; Paula's Estate and 1847 Astoria LLC for Count 4, the 2015 Transfer; and Paula's Estate, Pistikos, and Kaliampos for Count 7, the 2016 Transfer.

On the Mortgagee Defendants' motion for partial summary judgment on their third affirmative defense seeking an equitable lien, summary judgment is granted to Cathay dismissing the defense; Mortgagee Defendants are not entitled to a lien pursuant to the doctrine of equitable subrogation.

The parties are directed to attempt to resolve the amount of attorneys' fees to be awarded. Absent agreement, Plaintiff's counsel is directed to file any application for attorneys' fees consistent with this Order within 30 days. Defendants will have 30 days to respond, and any reply from Plaintiff will be due 15 days later.

Plaintiff's counsel is directed to file a letter within 30 days advising the court as to how it intends to proceed with the remainder of its claims.

**SO ORDERED.**

**_____/S/_____**
**NINA GERSHON**
**United States District Judge**

October 13, 2023
Brooklyn, New York